Adams *v.* W. J. Rainey, Inc., Appellant.

Argued September 27, 1938.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker and Rhodes, JJ.

*Jos. W. Ray, Jr.,* of *Shelby, Ray & Coldren,* with him *Herman M. Buck,* for appellant.

*David E. Bane,* with him *Eustace H. Bane,* of *Bane & Bane,* for appellee.

Opinion by Cunningham, J., December 20, 1938:

The sudden death of claimant's husband, during the course of his employment as a driver in one of the de-

540

fendant's mines, gave rise to this workmen's compensation case. It is not contended that the decedent, so far as "external" happenings were concerned, met with any unexpected, untoward, occurrence or mishap, outside of the usual course of events. A post-mortem examination disclosed that decedent had been afflicted for a number of years with a progressive and inevitably fatal disease of the aorta and coronary arteries and that the immediate cause of his death was "luetic aortitis with stenosis of the right coronary orifice and occlusion of left coronary orifice." Dr. Herbert Lund, the pathologist who performed the autopsy, translated his findings into "lay" terms as follows: "The man, Mr. Adams, —had a luetic—more commonly known as syphilis infection of his aorta,—syphilis. This caused a great increase of fibrous tissue or scar tissue in the aorta, which tissue narrowed the openings of the coronary arteries and caused complete occlusion of the left coronary orifice,—complete shutting off of the left coronary artery. Now the coronary arteries supply the heart muscle itself with blood, and with the narrowing and occlusion of the left coronary, this supply of blood is curtailed; and with improper nourishment the heart function ceased."

Dr. W. T. Myers, decedent's physician and called by the claimant, testified he had treated Adams at least twenty times during the year preceding his death for indigestion and irregular heart beat. In the light of the conditions shown by the autopsy, this witness said "there was no hope" for decedent and that any exertion such as walking rapidly, coughing or sneezing, would be detrimental to his heart.

Dr. G. H. Robinson, called by defendant, expressed the opinion that the sole cause of decedent's death was "coronary occlusion due to syphilis." An excerpt from his testimony reads: "From the autopsy report on this man it showed he was absolutely doomed to death, and his death could have occurred at any time; it might

have occurred while he was sleeping, or while he was eating a meal or while he was out walking. It was only a question of time as to when the blood supply to the heart was insufficient to carry on its work."

There was also testimony by fellow employees that decedent had not been in good health during the month preceding his death. One of them stated he took Adams' horse out of the mine for him each day the mine worked during that period, thereby permitting him to ride out on the man-trip because he complained his "wind was too short" to walk out.

It is therefore apparent that the question of law involved upon this appeal is whether there is any competent evidence upon this record to sustain a finding that claimant's husband died as the result of an "injury by an accident," as that term is used in our Workmen's Compensation Act of June 2, 1915, P. L. 736, 77 PS §411. If, in fact, Adams' death resulted from an "accident," the circumstance that he had an ailment which rendered him more susceptible to the injury than an ordinary person would have been would not defeat the right of his widow to compensation (*Clark v. Lehigh Valley C. Co.*, 264 Pa. 529, 107 A. 858) ; but if, as contended by the defendant, he died as the result of the natural progress of the fatal disease with which he admittedly was afflicted, the fact that death overtook him during the course of his employment does not make his death compensable. Claimant had the burden of proving that her husband's death resulted from an "accident" and not from natural causes. If she did not carry that burden successfully by the production of competent evidence, the judgment entered by the court below upon the award of compensation made by the referee and affirmed by the board must be reversed.

Although not specifically so stated by the compensation authorities, it is clear from the opinion of the board and of the court below that the theory upon which the award was made is that the "accident" making Adams'

death compensable, in their view, was a fortuitous strain upon his diseased heart caused by "over-exertion, unusual to his ordinary labor," put forth while assisting two miners in pushing an empty mine car up to the face of the coal for loading.

The contention of the defendant employer is that the evidence in behalf of claimant does not support a finding that Adams over-exerted himself in any way on the day of his death or did anything outside of the usual course of his employment, but, on the contrary, establishes that assisting in the pushing of empty cars was a part of the regular duties he had been performing for at least a week; that three cars were pushed into place that day; that nothing happened in pushing the third which was different in any way from the placing of the other two; and that the most favorable inference which can be drawn from the medical testimony is that Adams' death was hastened to some extent by the fact that he continued at his regular work when the condition of his aorta and coronary arteries demanded complete rest.

It therefore becomes necessary to examine the testimony in the light of these conflicting contentions relative to its import, and in the light of the general principles of law announced in prior appellate decisions.

There can be no doubt in this case that Adams' heart stopped beating because of the complete closing of the orifice of his left coronary artery. The controversy centers around the cause of the closing. If it was due to the natural increase of fibrous tissue in his aorta occasioned by the normal progress of the syphilitic infection, claimant's case falls, even though the closing may have been hastened by hard labor of the same general character and intensity as that usually performed by her husband: *Gausman v. Pearson Co.*, 284 Pa. 348, 354, 131 A. 247; *Pelusi v. Mandes et al.*, 109 Pa. Superior Ct. 439, 167 A. 456; *Kincel v. Feraco Const. Co. et al.*, 113 Pa. Superior Ct. 61, 172 A. 11; *McFadden v. Lehigh Nav. Coal Co.*, 111 Pa. Superior Ct. 501, 170

A. 314; and *Amentlar v. New Up. Leh. Coal Co.*, 131 Pa. Superior Ct. 97, 198 A. 678.

In the McFadden case, PARKER, J., speaking for this court, considered at length the whole question of "over-exertion" and reviewed the cases chiefly relied upon by the board and court below. *Keck v. John Mullen Const. Co. et al.*, 113 Pa. Superior Ct. 564, 173 A. 863, is an illustration of an accidental injury to a diseased internal organ which brought about a condition of the organ that could not be attributed to the normal and natural progress of the disease. *Kotkoskie v. N. W. Mine Co.*, 105 Pa. Superior Ct. 480, 161 A. 480, is an example of a compensable death attributable to an external accident—the unexpected catching and wedging of an overloaded coal car against the roof of the mine. The evidence showed the decedent in that case, while assisting his "buddy" in an endeavor to get the car free, exerted more than the amount of energy he had used while pushing other properly loaded cars that same morning. In the midst of their efforts the decedent slumped down and died from a bursted aorta.

With these principles and illustrations in mind we turn to a summary of the lay testimony. There was practically no controversy about any of the basic facts.

The claimant's husband was employed as a driver in defendant's mine and had been so engaged for four years until his death on October 4, 1935. His duties consisted in hauling empty cars or wagons to the coal facings and hauling the loaded cars away, using a horse for that purpose. In some entries, where the opening was narrow and the ceiling low, the horse could not be used, and it was necessary for the car to be pushed into position by man power and for Adams to assist the loaders in doing this. It was customary for him to lend assistance whenever it was needed.

On the day of his death, Adams went to work as usual, and in the course of his employment had placed, as they were needed, three empty cars in a heading

where two fellow employees, O'Hara and Sachman, were engaged in loading coal. The empties were first hauled to a switch approximately eighty feet from the face of the coal, and pushed one at a time from the switch to the face. For the first half of this distance the floor of the mine was level, and the three men pushed the car with their hands over rails laid partly on ties and partly on coal. From that point on the floor sloped upwards toward the face by an even gradient; that required two of the three men, Adams being one, when the car was within three or four lengths of the face, to turn around while the car was in motion and push with their backs. The loader in the middle continued to use his hands because of a bumper which prevented him from getting his back against the car. Each of these mine cars weighed approximately 3200 pounds. Although the loaders had been working in this particular entry for two weeks, Adams' help was needed for only about a week, due to the increasing distance the cars had to be pushed. On the morning of his death, he assisted in pushing three cars the full distance.

Various phrases were used by the different witnesses in attempting to describe the character of the grade as it approached the face of the coal. Some of them said it was "pretty steep," "real steep," another said, "middling heavy grade there—not extremely heavy," "if extremely heavy, it would have required another man to help."

As to the effort necessary to propel the car, Sachman said, "It was a pretty hard push, sure"; O'Hara, "Well, it was not so bad. If you kept it moving and didn't stop it was not so bad." Perhaps the most significant aspect of this portion of the testimony is that both of these loaders in this particular entry, who had been working there for two weeks, testified that all three of the cars pushed the same; they all push "pretty nearly just the same like one and another," and, in answer to a question referring to the third car O'Hara

testified: "Q. Would you consider the pushing of that car up into the working place, an unusually hard push? A. Well to my estimation they were practically all alike."

There was nothing unusual or different about the circumstances attending the pushing of the third car. Nothing happened that stopped it, or necessitated the use of extraordinary or unusual effort to get it going again.

After helping in placing the third car for loading, Adams said, "boys shovel up on this wagon and I'll be right back to change it for you," and walked away. They noticed nothing unusual about his appearance, and he gave no signs of over-exertion. A few minutes after the loaders began loading, one of them noticed a light down the heading about forty feet away, and after filling the car, went to investigate and found the lifeless body of Adams lying along the track.

The inference drawn by the referee from the testimony we have reviewed was stated by him in his eleventh finding of fact as the basis of his award. It reads: "Eleventh. After carefully weighing the testimony of both the claimant and the defendant we are of the opinion and find as a fact that decedent died, of a luetic aortitis of the right coronary orifice and occlusion of the left coronary orifice which was aggravated by the pushing of the wagon up the grade of this entry and that said exertion hastened the death of the decedent."

Under *Gausman v. Pearson Co.*, supra, and the other authorities to which we have referred, this finding is clearly insufficient to sustain an award, but it is all the testimony of Dr. Myers, claimant's medical expert, will support. At page 100a this question to the doctor and his answer appear: "Q. In your opinion, if he had not assisted in pushing the car on that up-grade, would he have died at that time? A. I just stated any exertion would be dangerous to a diseased heart such as the autopsy showed, and I think this *exertion would hasten*

*his death."* (Italics supplied) Again at page 102a: "Q. This man, judging from the condition found by Dr. Lund, this man had to die from this disease, did he not? A. Barring something happening to him very suddenly." There was no evidence that any external thing happened to Adams suddenly.

The board did not make any findings of its own, but, after referring to some of the testimony, concluded its opinion with the statement that "pushing the wagons was not usual to [Adams']employment, which was that of a driver." This statement is not only unsupported by any evidence in the case but is actually in direct conflict with the testimony at pages 25, 29, 32, and 49 of the record. It is also stated by the board that the pushing of the car "required of him great effort and strain by reason of the weight of the car and the grade." From the foregoing review of the evidence it is clear that the effort put forth by decedent on the day of his death in placing any of the cars was no greater or different in any way from that required, and repeatedly exerted by him, in performing his accustomed duties. The board cited and relied upon *Watkins v. Pittsburgh Coal Co.,* 278 Pa. 463, 123 A. 461, and *Durga v. Williams et al.,* 89 Pa. Superior Ct. 156, as supporting its affirmance of the referee's award. The facts in these cases distinguish them from the case now in hand.

In the Watkins case there were marks of external violence upon the forehead and cheek of the employee and the decision was not based solely upon the theory of acute dilatation of the heart superinduced by exertion. In the Durga case the decedent undertook to lift, without assistance, a scoop weighing 200 pounds and ordinarily requiring two men to lift it into place.

Moreover, the board seems to have ignored the testimony of Dr. Robinson, called by the defendant, to the effect that, in his opinion, there was no causal connection between the pushing of the car and the death of Adams. The basis of his opinion was thus stated by

him: "Q. Dr. Robinson in your opinion did the pushing on the wagon have any causative effect in producing the death of this claimant's decedent? A. None, as he had been doing it for sometime previous to this. Q. In other words you mean by that, as shown by the record, that it was part of his regular and usual work? A. Yes, part of his regular and usual work, and with that disease this disaster was going to occur at some time."

The importance of the testimony of decedent's fellow employees, to the effect that he exhibited no signs of over-exertion, and that they noticed nothing unusual about his appearance when he walked away after telling them to load the car, becomes more apparent in the light of the statement of Dr. Robinson that "if the physical exertion of pushing the car had caused the occlusion which caused death, it would have occurred immediately after or at the time of the exertion itself—as seen in people who die of a coronary occlusion while running for a street car." At another place in the course of his cross-examination the following question and answer appear: "Q. Then Doctor you want to leave the impression that a man with a heart condition as Mr. Adams had—that the effect of pushing that car into the place where it was to be loaded would have no effect whatever upon his heart? A. I wish to leave the impression that if the effect of pushing this wagon had caused the coronary occlusion to Mr. Adams, the symptoms causing this would have occurred at the time or immediately thereafter—of the pushing of the wagon."

An analysis of the testimony in the present case shows that there is not the slightest evidence of any unusual, fortuitous, or unexpected external happening in connection with the placing of the empty car—a feature which distinguishes this case from *Kotkoskie v. N. W. Mine Co.*, supra, nor is there any evidence upon this record of an injury to an internal organ creating a condition which would not have developed through the natural progress of the disease with which the decedent

was afflicted. This aspect of the case distinguishes it from the line of cases of which *Keck v. John Mullen Const. Co.,* supra, is an illustration. In cases of that type the happening of an accident, within the meaning of the statute, may be inferred from the circumstances under which the injury was received, and the character of the internal injury itself. *Cowell v. F. W. Woolworth Co.,* 119 Pa. Superior Ct. 185, 180 A. 752, is another illustration of the class of cases in which the accident may be inferred from the circumstances under which an internal injury, not attributable to the progress of any disease, was sustained.

On the other hand, the facts developed by the evidence in this case are so parallel with the facts in the cases of *Pelusi v. Mandes et al.,* supra, and *Amentlar v. New Up. Leh. Coal Co.,* supra, that we think those cases should be considered as controlling the disposition of the one now at bar. In the Pelusi case the decedent collapsed and died while engaged in heavy labor—pushing a wheelbarrow loaded with wet cement. A postmortem showed that the immediate cause of his death was the bursting of an aneurysm at the arch of his aorta. The medical testimony was to the effect that there was bound to be a rupture of the aneurysm at some time and that the continuous exertion incidental to his daily work had gradually enlarged the artery. The judgment entered upon an award of compensation was reversed because the record was barren of any evidence from which it could be found that the death of the employee was attributable to any "accident," rather than to the normal progress of his disease. In the Amentlar case the employee, who had arteriosclerosis, died from a hemorrhage of the brain while engaged with other employees in dragging poles weighing more than 100 pounds each over a course which was described as "a little rough." The medical evidence was to the effect that "the exertion accelerated his death and was a contributory factor [but] that he was 'likely to die'

at any time." In both cases the deaths were held to be noncompensable because, in the language of *Lesko v. Lehigh Valley Coal Co.,* 270 Pa. 15, 112 A. 768, (a death from cerebral hemorrhage), it was not shown that there was "any sudden, unlooked for, occurrence in the course of [the employee's] work calling for any extra exertion or strain other than that required by his usual and ordinary labor for the day."

In our opinion, the following language of PARKER, J., in the Amentlar case is equally applicable to the case at bar: "Here [the decedent] was suffering from a progressive disease which was shown by claimant's own witnesses to be a possible cause of death at any time. This excludes that line of cases where one in good health is suddenly incapacitated and from the circumstances an accidental cause may be inferred. While claimant's doctor testified that the exertion was a contributing cause of death, such fact, if accepted, was not sufficient to support the claim. As we pointed out at the outset, the compensation law does not cover all injuries resulting to an employee while in the course of his employment; he must prove that there was at least a contributory and accidental cause. The claimant is left without any support in the record for her claim that the injury was due to an accident, since there is not any evidence that her decedent was performing any unusual work or in fact any other kind of work than he performed regularly or that he was doing it in an unusual manner. There was no evidence from which an accident might be inferred and no external and unusual happening. The claim cannot be sustained for the primary reason that there was no evidence of an accident and the burden of proof was on claimant." Natural sympathy for the unfortunate claimant and her children cannot be permitted to become a substitute for evidence.

Judgment reversed and here entered for appellant.