Monahan *v.* Seeds & Durham et al., Appellants.

Argued December 13, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-FELD, PARKER and RHODES, JJ.

*Frank R. Ambler,* for appellants.

*J. Webster Jones,* with him *Elmer C. Pfeiffer,* for appellee.

OPINION BY CUNNINGHAM, J., January 31, 1939:

In this appeal by the employers and their insurance carrier from the judgment entered below upon an award of compensation to the widow and children of Leo P. Monahan no basic fact is in serious dispute; the controversy relates to the result of the application of the provisions of our Workmen's Compensation Act of June 2, 1915, P. L. 736, to the facts as found by the board.

Claimant's husband, a resident of Norristown, had been employed for a number of years by Seeds & Durham, contractors, as a timekeeper and purchasing agent. In the summer of 1934 his employers were building a dam for the federal government across the Allegheny River at Aquitonia, fourteen miles above Pittsburgh. Monahan, as day timekeeper, was required to report his pay roll figures to Washington within five days after the end of each month. It is conceded that his sudden death about six o'clock on the morning of Saturday, July 28, 1934, occurred in the course of his employment. There was some controversy over the immediate physical cause of death. No autopsy was held, but the certificate of death, signed by the deputy coroner of Allegheny County and filed pursuant to the Act of June 7, 1915, P. L. 900, as amended, 35 PS §471, gave as the cause of death "cerebral hemorrhage." Dr. H. S. D. Mock, the physician called immediately after Monahan's death, questioned the accuracy of the certificate and, while

testifying for appellants, expressed the opinion that death was caused either by a cerebral hemorrhage or by "acute dilatation of the heart"—more probably the latter. As the certificate was admitted without objection and the statute provides it shall be prima facie evidence of the facts stated therein, and as appellants produced no direct evidence to the contrary, the board was justified in finding, under all the evidence, that Monahan died of a cerebral hemorrhage. It is not necessary to decide in this case whether the certificate was evidence of the "cause" as distinguished from the "fact" of death. It is sufficient to say the finding did not depend solely upon the certificate. In this connection it should be noted the medical experts substantially agree that, in the absence of an external injury, cerebral hemorrhages occur only in persons who have diseased arteries in their brains—arteriosclerosis being the usual disease. One of the appointed impartial experts, Dr. William D. Stroud, testified: "Well first of all you have to have a diseased blood vessel to the brain and usually that disease is arteriosclerosis—it may be syphilitic changes, and then the usual factors which raise the blood pressure to a point where that blood vessel ruptures and we have a cerebral hemorrhage are thought to be physical effort and anxiety and worry, and various forms of mental reactions." As factors contributing to arteriosclerosis, this witness mentioned streptococcic infections and obesity. Monahan was of average height, weighed 240 pounds, and was 38 years of age.

Dr. Edwin J. Kalodner, a physician appointed by the board as an impartial expert, testified it was his opinion that Monahan had advanced arteriosclerosis localized in his brain.

With this medical testimony in mind, we take up the circumstances under which the employee's death occurred.

During the entire week ending on the day Monahan was stricken the temperature was high, the maximum ranging from 87 to 90 degrees. Toward the latter part of the week it was discovered that some mistake had been made in compiling the figures for the pay roll. Monahan had been working some days during that week longer than the regular ten hours. On Friday, July 27, 1934, he went to work at his regular time, 7:00 A.M., and worked all day. When Thomas W. Newcomb, the night timekeeper, came on duty that evening Monahan had dinner with him about six o'clock and both returned to the office. Newcomb testified: "A. ...... we come back and went to work and checked the pay roll, then around twelve o'clock or—Q. You worked steadily from that time to twelve o'clock is that right? A. I wouldn't say how steadily. Q. You weren't off the job? A. No, we were on the job, we went up the street and got something to eat and come back again. Q. And continued to work how long? A. Continued to work until Mr. Monahan died."

An excerpt from his cross-examination reads: "Q. What time did Mr. Monahan die? A. About six o'clock. [Saturday morning] Q. What was he doing at the time? A. We were sitting at the desk, checking the pay roll. Q. Sitting in a chair? A. Yes, he was sitting in a chair like the one you are sitting in. Q. And the pay roll he was checking he held in his hand, or was it on the desk? A. On the desk. Q. How long had he been sitting in the chair that way? A. Might have been an hour, might have been two hours, I don't recall. Q. A couple of hours. And what was he doing, just calling out figures? A. He was calling out the figures to me and I was reading them. Q. You were checking them? A. Yes. Q. And just tell us what occurred? A. I was sitting—he was sitting to my left, there were two desks against one another, he was at my left and he was calling out these figures from the time book and I was pointing down to check

with the pay roll, we were hunting for a mistake, that is why we were working so late, and all of a sudden he come to this point in the book and said, 'Here is the mistake' and in that time his head slumped forward and he gasped a few times—"

The ground upon which compensation was sought was thus stated in the claim-petition: "Deceased came to his death from over-exertion as a result of continuing at work for the defendant many hours overtime—almost 24 hours continuously on day of death under excessive heat conditions."

It is contended on behalf of claimant that the mental and physical exertion put forth by Monahan in hunting all night long for the mistake in the figures was so far out of the usual course of his employment and the ordinary current of events, that it amounted to "over-exertion," within the meaning of our appellate decisions, and that any violence occasioned thereby to the internal physical structure of his body would be "an injury by an accident," within the intendment of Section 301 of the statute, 77 PS §411.

The referee to whom the claim was originally assigned entered a disallowance. The board, in a comprehensive opinion by Chairman Ullman, held that "the twenty-three hours of almost continual work in search of a mistake in the books constituted such over-exertion that any disability shown to result from it would be compensable." The record was assigned to another referee to find whether there was a causal connection between the over-exertion and the death of the employee.

Under examination by the referee, Dr. Kalodner testified: "Q. Have you formed an opinion as to the causal connection between Mr. Monahan's death and the work which he was performing prior thereto? A. I have. Q. What is your opinion? A. It is my opinion that the over-exertion that Mr. Monahan was subjected to immediately preceding his death aggravated or accelerated his death. Q. And when you state 'the over-exertion to

which he was subjected,' to what do you make reference? A. I make reference to the twenty-three hours of practically continual work, with putting [forth] every effort pondering over the books to find a mistake. He had long hours of mental strain, mental concentration that increased his already apparently existing blood pressure thus causing a rupture of a blood vessel in his brain. ...... Q. And [does] the fact that the work was more of a mental nature, or character, rather than a physical character; does that make any difference in the opinion which you have expressed? A. No, sir; it would not. Q. You subscribe to the opinion that a man may be mentally over-exhausted as well as physically over-exhausted and that either of these may accelerate a condition of the heart, shall we say? A. Yes, sir. Q. Or circulatory system? A. Circulatory system. Q. The net result of which hastened this man's death? A. Yes." This testimony measured up to the requirements of the latest pronouncement of the Supreme Court upon the subject. See *Elonis v. Lytle Coal Company*, 134 Pa. Superior Ct. 264, 3 A. 2d 995.

In contrast with the testimony just quoted, Dr. George D. Geckeler, called by appellants, "guessed" the cause of death might have been a coronary thrombosis rather than a cerebral hemorrhage. To the referee's question whether he had formed an opinion as to the cause of death he replied: "I have not formed an opinion, I would guess and my guess probably would be as good as the next doctor, and probably better than that of the deputy coroner, that the cause of death most likely was coronary thrombosis, because that is the most likely cause of a death in a man of that age to have occurred suddenly."

The second referee also disallowed the claim, stating he was "inclined to believe the decedent died of an acute dilatation of the heart, which resulted from the natural progress of his disease, arteriosclerosis, rather than a cerebral hemorrhage, such as could have been

caused by great mental effort or mental stress." Upon claimant's appeal, the board, in a second opinion by its chairman, set aside the findings and conclusions of the referee and substituted therefor its own. The board's seventh finding of fact and second conclusion of law read:

"Seventh: We find as a fact that twenty-three hours of continuous work constituted extraordinary exertion and that this extraordinary exertion is directly and causally connected with and responsible for the death of the decedent, said exertion and great mental effort, coupled with the fact that the decedent suffered from arteriosclerosis, resulting in his death from a cerebral hemorrhage.

* * * * * * *

"Second: Decedent's death on July 28, 1934, from a cerebral hemorrhage was the result of an accident in the course of his employment, and the claimant and her minor children are entitled to compensation."

Upon the appeal of the employers and their carrier to the court below, that tribunal, in an able opinion by DANNEHOWER, J., entered judgment upon the award.

We are of opinion, from our review of this record, that the findings of fact as made by the board are supported by competent evidence and that the law has been properly applied by the board and court below to those findings.

The novel feature of this case is that the over-exertion relied upon was more mental than muscular. We see no reason for holding that the over-exertion which may make an injury or death resulting therefrom compensable must be solely physical in character. Authoritative definitions of "exertion" do not confine its use to muscular effort. As defined in Funk and Wagnall's Standard Dictionary, quoted in the first opinion of the board, it is "the act of putting some power or faculty into vigorous action; a strong effort." The Oxford English Dictionary defines it as "the action or habit of exerting

or putting into active operation an· organ, the faculties, or habit of the body or mind." As expressed by the court below, there is no fundamental difference in law or principle between an injury or death caused by the cutting or crushing of a blood vessel in the brain through the application of external violence and the breaking of one through increased internal pressure due to the putting forth of an unusual or abnormal mental effort.

It is not necessary to review the decided "over-exertion" cases at any length. That subject was fully considered by this court in *McFadden v. Lehigh Nav. Coal Co.,* 111 Pa. Superior Ct. 501, 170 A. 314, and more recently in *Adams v. W. J. Rainey, Inc.* 133 Pa. Superior Ct. 538, 3 A. 2d 270. Certain principles, which must be kept in mind in disposing of the case at bar, have been laid down in our appellate decisions.

The fact that Monahan was afflicted with a pre-existing arteriosclerosis which rendered him more susceptible to the injury alleged than an ordinary person would have been will not, in and of itself, defeat his widow's claim for compensation: *Clark v. Lehigh Valley C. Co.,* 264 Pa. 529, 107 A. 858.

But where an employee has a progressive disease, the natural and normal progress of which is liable to cause his death at any time *(Pelusi v. Mandes et al.,* 109 Pa. Superior Ct. 439, 167 A. 456, and the Adams case supra), the fact that death overtakes him while he is engaged, under his normal working conditions, in labor of the same character and intensity as that usually performed by him does not render his death compensable, even though it may have been hastened by such labor: *Gausman v. Pearson Co.,* 284 Pa. 348, 131 A. 247.

In order to make a death from exertion compensable it must appear from the evidence that something unexpected, fortuitous and not to be anticipated, occurred in the course of the employee's work, calling for the putting forth of an extra effort or strain over and be-

yond that required by his usual and ordinary work. *Lesko v. Lehigh Valley Coal Co.,* 270 Pa. 15, 112 A. 768. "Over-exertion" is used in the cases in a limited sense; it means the expenditure of unusual and excessive effort by reason of some unexpected external happening.

We think this claimant has shown by competent evidence that the discovery toward the end of a month of a discrepancy in the figures was an unexpected and untoward event which required Monahan to put forth an unusual and extraordinary effort, both mental and physical, considerably, in excess of that normally to be expected in the usual course of his employment.

Those circumstances take this case out of the line of which *Pelusi v. Mandes et al.,* supra., *Amentlar v. New Up. Leh. Coal Co.,* 131 Pa. Superior Ct. 97, 198 A. 678, and *Adams v. W. J. Rainey, Inc.* supra, are examples, and bring it within the line illustrated by *Kotkoskie v. N. W. Mine Co.,* 105 Pa. Superior Ct. 480, 161 A. 480, *Tracey v. Phila. & Reading C. & I. Co.,* 270 Pa. 65, 112 A. 740; *Clark v. Lehigh Valley C. Co.* supra, and *Foster v. State College Borough et al.,* 124 Pa. Superior Ct. 492, 189 A. 786. Moreover, they are the surrounding circumstances from which it may reasonably be inferred that the injury to Monahan's brain was an accidental one within the meaning of the statute.

We have read the able and detailed brief of counsel for appellants with care and interest, but are not convinced any of the assignments of error should be sustained.

Judgment affirmed.